**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. |
| v. | |
| BRASKEM, S.A., | |
| Defendant. | |

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**<u>SUMMARY</u>**

1.      This action arises from violations of the Foreign Corrupt Practices Act ("FCPA") by Braskem S.A. ("Braskem" or the "Company"), a Brazilian petrochemical company.

2.      Beginning in at least 2006 and through approximately 2014, Braskem paid bribes to foreign political parties and foreign officials in the government of Brazil in order to assist Braskem in obtaining or retaining business in that country.  Braskem paid theses bribes through a complex web of international intermediaries and offshore bank accounts.  Certain senior Braskem executives authorized and approved these payments while knowing that all or a portion of the funds would be passed onto foreign officials in the government of Brazil.

3.      Braskem made approximately $250 million[1] in improper payments to an illicit network that its controlling shareholder operated and used to make improper payments during the relevant time period.  At least $75 million of the amount paid into the illicit network was

_____

[1] Unless otherwise indicated, all dollar amounts are represented in U.S. dollars.

used for bribes that directly benefited Braskem.

4.      The bribes Braskem paid during the relevant time period went to various foreign officials in Brazil, including at least one official at Petróleo Brasileiro S.A. ("Petrobras"), the Brazilian state-owned petroleum company, senators and representatives of the Brazilian congress, and foreign political party officials with at least two leading political parties in Brazil.

5.      In exchange for the bribes, a government official at Petrobras intervened on Braskem's behalf in connection with the pricing formula for a 2009 supply agreement for the purchase from Petrobras of naphtha, the raw material used in Braskem's production of petrochemicals.  This favorable pricing formula reduced Braskem's price of naphtha by approximately $94 million from approximately March 2009 until February 2014.

6.      Braskem also received several tax credits and benefited from other legislative measures over the relevant time period of time that allowed it to avoid approximately $187 million in consolidated expenses and costs.  Finally, Braskem netted approximately $8 million when certain executives at the Company bribed officials in the Brazilian government, who used their influence with Petrobras to prevent Petrobras from terminating a joint venture agreement involving a polypropylene plant.  Petrobras's continued involvement in the polypropylene plant made it more profitable for Braskem.

7.      The illicit payments were paid directly by Braskem, or by its Cayman Islands-based subsidiary, Braskem Incorporated Ltd., to intermediaries disguised as export consulting companies using accounts in the U.S., among other jurisdictions.

8.      Braskem and its subsidiary, at the direction of these senior executives, created false books and records to conceal the bribe payments.  These payments were improperly recorded as legitimate commission expenses in Braskem's books and records and were

consolidated into Braskem's financial statements.  Braskem's internal accounting controls were inadequate because they failed to prevent such payments or detect red flags that should have alerted its employees that these payments, in whole or in part, were fictitious and used to bribe foreign officials.

9.       As a result of its conduct, Braskem violated Section 30A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78dd-1] when it authorized or paid bribes to foreign political parties and foreign officials in the government of Brazil to influence their decisions securing improper advantages or to induce them to use their influence to affect the acts or decisions of a foreign government or instrumentality in order to assist Braskem in obtaining or retaining business.  Braskem violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] when it created false books and records to conceal the bribery scheme.  Braskem also violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] by failing to have sufficient internal accounting controls in place to detect and prevent the authorization of the illicit payments over an extended period of time.

10.      Braskem is reasonably likely, unless restrained and enjoined, to continue to engage in the acts and practices set forth in this complaint, and in acts and practices of similar purport and object.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12.      Braskem has shares registered with the Commission pursuant to Section 12(b) of the Exchange Act and files periodic reports with the Commission.  The shares registered are represented by American Depositary Receipts that are traded on the NYSE under the symbol

BAK.  Braskem's shares were registered with the Commission pursuant to Section 12(b) of the

Exchange Act [15 U.S.C. § 78l].  As such, Braskem was required to file reports, including Form

20-F, with the Commission pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m],

and the related rules thereunder, and was an "issuer" within the meaning of the FCPA [15 U.S.C.

§ 78dd-1, *et seq.*].

13.     Braskem, directly or indirectly, made use of the means or instrumentalities of

interstate commerce, of the mails, or of the facilities of a national securities exchange in

connection with the transactions, acts, practices, and courses of business alleged in this

Complaint.

### DEFENDANT

14.     **Braskem S.A.** is a company headquartered in São Paulo, Brazil that produces

petrochemical and thermoplastic products.  The Company is the largest producer of

thermoplastic resins in the Americas and the only producer of ethylene, polyethylene, and

polypropylene in Brazil.  As of 2015, Braskem had approximately 8,000 employees and

approximately $47 billion *reais* in net sales.

### RELATED ENTITIES

15.     **Odebrecht S.A. ("Odebrecht")** is a privately-held company based in Brazil that

indirectly owned approximately 38% of Braskem's outstanding share capital and approximately

50.11% of the Company's voting share capital directly or through a wholly-owned subsidiary

during the relevant time period.  Odebrecht is the holding company of a conglomerate engaged in

engineering, oil and gas, real estate development, and other ventures.  Odebrecht's then chief

executive served as Chairman of Braskem's board of directors during the relevant time period

and played a key role in Braskem's involvement in the illicit bribery scheme alleged herein.

16.      **Petróleo Brasileiro S.A. ("Petrobras")** is an integrated energy company based in Rio de Janeiro, Brazil with operations in about 28 countries.  The company had securities registered with the Commission, represented as American Depositary Receipts, which are traded on the NYSE under the symbol PBR.  As of December 31, 2015, the Brazilian federal government held approximately 3.74 billion of the more than 7.4 billion Petrobras outstanding common shares (or approximately 50.5%).  As such, Petrobas was a state-owned enterprise and its employees are "foreign officials" under the FCPA [15 U.S.C. § 78dd-1(f)(1)(A)].  Petrobras also owned approximately 36.07% of Braskem's outstanding share capital and 47.03% of the Company's voting share capital during the relevant time period.

17.      **Braskem Incorporated Ltd.** is a wholly-owned operating subsidiary of Braskem based in the Cayman Islands.

## FACTUAL ALLEGATIONS

### A.      The Illegal Payment Scheme

18.      Beginning in approximately 2006, senior Braskem executives authorized and directed the payment of bribes to foreign officials in the government of Brazil.  As a result, Braskem secured an improper advantage in order to obtain or retain business in Brazil.

19.      The bribery scheme used a complex network of offshore shell companies, bank accounts located in traditional tax havens, individual currency dealers, and off-book financial accounts in order to make improper payments to government officials, political parties, and improper political campaigns contributions in Brazil.  Former senior executives at Braskem diverted Braskem funds into Odebrecht's off-book accounts in or around 2006 to make these illegal payments to foreign officials in the government of Brazil for the benefit of Braskem in Brazil.

20.     At the time, Odebrecht was Braskem's controlling shareholder and had the power to appoint or designate, and did appoint or designate Braskem's CEO and CFO.  Then senior Braskem and Odebrecht executives during the relevant time period approved the funds that Braskem diverted through Odebrecht's off-book accounts.

21.     Braskem, directly or through its subsidiary, diverted funds into the Odebrecht's off-book accounts by fabricating commission and making payments into offshore bank accounts controlled by three shell companies.  The shell companies then facilitated the transfer of the Braskem money into the Odebrecht off-books accounts that could then be used to make the improper payments.

22.     Between approximately 2006 and 2014, Braskem diverted approximately $250 million into the Odebrecht off-book accounts in order to facilitate bribe payments to officials in the government of Brazil to benefit Braskem in Brazil.  Specifically, Braskem paid approximately 87.5 million *reais* (valued at approximately $26 million presently) to one shell company formed in June 2006 (referred to as "Consultant A").  Braskem paid 272.2 million *reais* (valued at approximately $81 million presently) to another shell company also formed in June 2006 (referred to as "Consultant B").  Braskem also paid an additional 18.5 million *reais* (valued at approximately $5.5 million presently) to Consultant A and Consultant B.

23.     Additionally, Braskem Incorporated Ltd. paid $1.9 million to Consultant A, $2 million to Consultant B, and $10.5 million to a third shell company (referred to as "Consultant C") during the relevant time period.

24.     The invoices these shell companies delivered to Braskem typically identified the amount due as "commissions on the amount FOB exports to your various customers…" during a certain period of time.  The invoices further referred to an export agency agreement.  However,

no export services were required for the customers or products involved in these dealings. Additionally, no valid agency agreement existed. Thus, no commissions were ever incurred or due on the exports or for the customers identified in the invoices. As a result, these invoices bore no relation to any legitimate services that these entities rendered.

25.     Braskem's payments to Consultant A and Consultant B were improperly recorded in at least 926 general ledger entries at Braskem as Commissions Payable. Braskem Incorporated Ltd.'s payments to Consultant A, Consultant B, and Consultant C were improperly recorded in at least 14 general ledger entries as Commissions Payable. Braskem Incorporated Ltd.'s payments were paid in U.S. dollars and, in some instances, through financial institutions in the U.S. and its books and records were consolidated in Braskem's financial statements filed with the Commission.

26.     In all, Braskem, directly or through its subsidiary, paid approximately $250 million into Odebrecht's off-book accounts. Former senior Braskem executives were aware at the time they approved the payments that the funds paid to Consultant A, Consultant B, and Consultant C would be passed, in whole or in part, on to government officials in the government of Brazil, including the Petrobras and Brazilian party officials referred to in this Complaint.

### a.     Braskem's illegal payments to Petrobras officials relating to a polypropelyne plant located in Paulinia, Sao Paulo (Brazil)

27.     In or around 2005, Braskem and Petrobras executed an agreement for a joint venture between Petrobras and Braskem to build a plant. Due to public pressure, senior Braskem executives feared that Petrobras intended to terminate the agreement even though early termination of the agreement would have required Petrobras to pay Braskem an early termination penalty.

28.     At least two former senior Braskem executives met with Petrobras's chief downstream officer ("Brazilian Official A") and a Brazilian congressman ("Brazilian Official

7

B"). Brazilian Official A and Brazilian Official B demanded that Braskem pay them, and

Braskem did pay them, approximately $4.3 million in exchange for their influence to prevent

Petrobras from terminating the agreement. The direct financial benefit to Braskem by avoiding

the early termination of this agreement was approximately 27 million *reais* (valued at

approximately $8.4 million presently).

29.     Braskem paid all of the approximately $4.3 million in bribes through Odebrecht's

off-book accounts. Braskem mischaracterized the payments in its books and records as

Commissions Payable even though at least two of its then senior executives knew these funds

were reasonably likely passed through to foreign officials in Brazil. These payments were

consolidated in Braskem's financial statements as legitimate business costs or expenses. As a

result, Braskem did not, in reasonable detail, accurately and fairly reflect these payments in its

books and records.

> **b.      Braskem's illegal payments to Petrobras officials relating to
> the 2009 naphtha supply agreement**

30.     In or around 2008, Petrobras and Braskem began negotiating with Petrobras for a

supply agreement for the sale and acquisition of naphtha, a derivative from crude oil Braskem

uses in its petrochemical production. Braskem is Brazil's largest consumer of naphtha and

purchases approximately 70% of its demand from Petrobras, the only Brazilian supplier of

naphtha.

31.     At and before this time, Petrobras determined the price for naphtha by using the

international market price for naphtha + $2. The international market price of naphtha is

historically linked to the Amsterdam-Rotterdam-Antwerp market price of naphtha (typically

referred to as "ARA") and to the fluctuating *reais*/U.S. dollar exchange rate. In 2008, Petrobras

wanted to negotiate long term supply contracts directly with petrochemical companies such as

Braskem.

32.     In or around late-2008, a former senior Braskem executive met again with Brazilian Official A and Brazilian Official B to negotiate a long-term naphtha supply agreement between Braskem and Petrobras.

33.      The former senior Braskem executive agreed to pay, and Braskem did pay, Brazilian Official A and Brazilian Official B approximately $20 million over time.  In return, Brazilian Official A and Brazilian Official B used their influence over the contract approval process at Petrobras to require that the  naphtha supply contract with Braskem use a pricing formula that reduced Braskem's cost of naphtha.

34.     During the negotiations between Braskem and Petrobras from approximately November 2008 until Braskem and Petrobras signed the naphtha supply contract in July 2009 (made retroactive to March 2009), Brazilian Official A represented Petrobras as its lead negotiator.

35.     Brazilian Official A also used his influence over Petrobras's technical team and the Petrobras executive board to approve a supply agreement that reduced Braskem's cost of naphtha by approximately $94 million from March 2009 through February 2014.  Petrobras terminated the contract in or around February 2014.

36.     During the relevant time period, Brazilian Official A met with former senior Braskem executives on an annual basis to confirm and authorize the bribe arrangement.  The intermediary also met directly, or through an employee, with another former senior Braskem executive to receive bank wire transfer information and to deliver wire transfer confirmations.

37.     Braskem paid all or a portion of the approximately $20 million in bribes through Odebrecht's off-book accounts.  Braskem mischaracterized the payments in its books and

records as Commissions Payable even though certain of its then senior executives knew these funds were reasonably likely passed through to government officials in Brazil.  These payments were consolidated in Braskem's financial statements as legitimate business costs or expenses. As a result, Braskem did not, in reasonable detail, accurately and fairly reflect these payments in its books and records.

> **c.** **Braskem's illegal payments to officials in the Brazilian federal legislature relating to several legislative measures**

38.      Beginning in or around 2006, senior Braskem executives agreed to pay bribes, and Braskem did pay bribes, to foreign officials in the government of Brazil in exchange for certain legislative measures that would benefit, and did benefit, Braskem.  The measures included, but were not limited to, passing a law allowing a tax credit for the purchase of naphtha and expanding the credit to other raw materials used in the petrochemical industry.

39.      For example, prior to 2005 Brazilian law did not allow companies to take any tax credit for the acquisition of naphtha.  In 2005, the Brazilian congress passed a measure into law that provided a 3.65% tax credit for the acquisition of naphtha.  In 2013, the 3.65% tax credit was expanded to include other raw materials Braskem acquired.

40.      As described herein, Braskem began diverting funds into Odebrecht's off-book accounts through Consultant A, Consultant B, and Consultant C in or around 2006.  These funds were ultimately passed on to officials in the government of Brazil as part of the illicit bribe scheme described herein.  A portion of the funds passed through Odebrecht's off-book accounts went to officials in the government of Brazil in exchange for the passing of the tax laws in 2005 and 2013.

41.      Specifically, three former senior Braskem executives agreed to divert Braskem funds to two officials in the Brazilian senate and two Brazilian representatives in exchange for

their influence to increase and extend the tax credit on naphtha to other raw materials that

Braskem acquires in the general course of its business.  In all, Braskem illegally paid these

officials approximately 6 million *reais*, or approximately $1.74 million in or around October

2013.

42.     Moreover, a Braskem director instructed Braskem to divert approximately 100

million *reais*, or approximately $29 million, in funds through Odebrecht's off-book accounts to

officials in one of Brazil's leading political parties to use their influence in order to assist in

obtaining the result of increasing and extending the tax credit to include raw materials other than

naphtha.

43.     Braskem's financial benefit from the 2005 tax credit was approximately 62

million *reais*, or approximately $19 million.  Braskem also saved approximately $168 million

through the end of 2013 from the 2013 tax credit.

44.     The bribes paid to influence foreign officials to enact the tax credits were

processed through Odebrecht's off-book accounts as payments to Consultant A, Consultant B,

and Consultant C, and recorded as Commissions Payable.  These payments were consolidated in

Braskem's financial statements as legitimate business costs or expenses.  As a result, Braskem

did not, in reasonable detail, accurately and fairly reflect these payments in its books and records.

### B.     Lack of Compliance and Failure to Maintain Adequate Internal Accounting Controls

45.     During the relevant time period, Braskem's policies, procedures, or controls did

not specifically address the FCPA.  For example, Braskem's Code of Conduct during the

relevant time period referred to employees' relationship with clients and shareholders and

governed the use of privileged information.  However, Braskem's Code of Conduct in effect at

the time failed to prohibit improper payments to foreign officials or political parties or reference the FCPA.

46.     Braskem had an ethics committee comprising four full members, including a legal representative, who decided matters relating to Braskem's Code of Ethics and other policies. Braskem employees were encouraged to report potential misconduct by Company employees, third-party suppliers, and clients through an ethics line.  The allegations contained in this Complaint were never reported through Braskem's ethics line or to its ethics committee even though the improper payments were significant over time and the approval of such payments involved certain senior Company managers who understood the purpose of the "commission" payments to the intermediary companies.

47.     Braskem's procurement and accounts payable processes during the relevant time period lacked adequate payment approval standards and were easily manipulated by the senior executives.  For example, Company employees could manually add commission payments to third parties without verification of the existence of a contract.  The same employee that added the commission payment could then send the request for payment without the need for approval by a second employee.

48.     The improper payments to third-party agents such as Consultant A and Consultant B could have been prevented or detected if Braskem's internal accounting controls had required the payments to be attached to a valid contract, which they did not.  In fact, Braskem did not have a valid agency or consulting agreement with Consultant A, Consultant B, or Consultant C. The improper payments to Consultant A, Consultant B, and Consultant C were made without the identification of a legitimate sale or a customer connected to the payment of the commission remitted.  As a result, Braskem's limited internal procurement controls lacked the creation of

records to provide reasonable assurances that payments were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles in Brazil and the U.S. and failed to maintain accountability for its assets.

## CLAIMS FOR RELIEF

## FIRST CLAIM

### Violations of Section 30A of the Exchange Act

49.     Paragraphs 1 through 48 are re-alleged and incorporated by reference.

50.     As described above, Braskem, through its officers, directors, employees, or agents corruptly offered, promised to pay, or authorized unlawful payments to one or more persons, while knowing that all or a portion of those payments would be offered, given, or promised, directly or indirectly, to foreign officials for the purposes of influencing their acts or decisions in their official capacity, inducing them to do or omit to do actions in violation of their lawful duties, securing an improper advantage, or inducing such foreign officials to use their influence with a foreign government or instrumentality thereof to assist Braskem in obtaining or retaining business.

51.     By reason of the foregoing, Braskem violated, and unless enjoined, will continue to violate, the anti-bribery provisions of the FCPA, as codified at Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

## SECOND CLAIM

### Violations of Section 13(b)(2)(A) of the Exchange Act

52.     Paragraphs 1 through 48 are re-alleged and incorporated by reference.

53.     As described above, Braskem, through its officers, agents, subsidiaries, and affiliates, failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

54.     By reason of the foregoing, Braskem violated, and unless enjoined, will continue to violate, the books-and-records provisions of the FCPA, as codified at Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

### THIRD CLAIM

### Violations of Section 13(b)(2)(B) of the Exchange Act

55.     Paragraphs 1 through 48 are re-alleged and incorporated by reference.

56.     As described above, Braskem, through its officers, directors, employees, or agents acting on its behalf, failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) payments were made in accordance with management's general or specific authorization; and (ii) payments were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for its assets.

57.     By reason of the foregoing, Braskem violated, and unless enjoined, will continue to violate, the internal accounting controls provisions of the FCPA, as codified at Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A.     Permanently restraining and enjoining Braskem, and its officers, agents, servants, employees, attorneys, and all person in active concert or participation with it who receive actual

notice of this injunction by personal service or otherwise, from violating Sections 30A,

13(b)(2)(A), and  13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A), &

78m(b)(2)(B)];

      B.      Ordering Braskem to disgorge ill-gotten gains, illegal losses avoided, and unjust

enrichment obtained as a result of its illegal conduct;

      C.      Granting such other and further relief as the Court may deem just and appropriate;

and

      D.      Retaining jurisdiction over this action in order to implement and carry out the

terms of all orders and decrees that it may enter, or to entertain any suitable application or

motion by the Commission for additional relief within the jurisdiction of this Court.

Dated:   December 21, 2016             Respectfully submitted,

                                           /s/ David S. Johnson
                                         David S. Johnson
                                       Assistant Chief Litigation Counsel
                                       D.C. Bar No. 477298
                                       **SECURITIES AND EXCHANGE**
                                       **COMMISSION**
                                       100 F Street, N.E.
                                       Washington, D.C. 20549
                                       Direct Dial: (202) 551-2218
                                       E-mail: johnsonds@sec.gov

                                       Ernesto Palacios
                                       Senior Counsel, FCPA Unit
                                       Florida Bar No. 0529168
                                       Direct Dial: (305) 982-6306
                                       E-mail: palaciose@sec.gov
                                       Attorneys for Plaintiff

Of Counsel:

Thierry Olivier Desmet
Assistant Director, FCPA Unit
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131